409 So.2d 323 (1981)
William J. MOSS, et al
v.
Anthony J. GUARISCO, Sr., et al.
William J. MOSS
v.
Anthony J. GUARISCO, Sr., et al.
Nos. 14395, 14396.
Court of Appeal of Louisiana, First Circuit.
December 22, 1981.
Rehearing Denied February 18, 1982.
*325 Peter C. Piccione, Lafayette, and John E. Conery, Conery & Breaux, Franklin, for plaintiffs.
Nathan A. Levy, Jr., and Joseph R. Streva, Jr., Levy & Burleigh, Morgan City, for Anthony Guarisco, Sr. and Guarisco Motor Co.
George H. Robinson, Jr., Liskow & Lewis, Lafayette, for General Motors Corp.
Jerome J. Barbera, III, Thibodeaux, for Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. and Sam J. Barbera.
Before ELLIS, LOTTINGER and PONDER, JJ.
LOTTINGER, Judge.
These consolidated suits allege breach of contract, inducement to breach contract, and illegal conspiracy in restraint of trade. Plaintiffs appeal the sustaining of the peremptory exception of no cause of action in favor of all defendants except Anthony J. Guarisco, Sr.
The original suit, No. 14395, was brought by William J. Moss, individually and on behalf of Guarisco-Moss Motors, Inc. as a result of an alleged breach by Anthony J. Guarisco, Sr. (Guarisco) of a buy-sell contract. The contract involved a transfer of the Pontiac dealership in Morgan City, Louisiana, which at the time of the making of the contract was operated by Guarisco and his brother John in the corporate name of Guarisco Motor Company, Inc. Moss, the alleged purchaser, sued alleging breach of the buy-sell agreement and demanding specific performance of the agreement from Guarisco, Sr. and from General Motors Corporation, Pontiac Motor Division, the franchisor for Pontiac and GMC automobiles. The original petition was subsequently amended to add Guarisco Motor Company, Inc., Sam C. Barbera, Jr. (Barbera), and Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. (Guarisco-Barbera) as parties defendant, and to allege that all the defendants engaged in an illegal conspiracy in restraint of trade which caused damage to the plaintiffs.
A second suit, No. 14396, was simultaneously filed by William J. Moss individually, maintaining the same allegations.
Exceptions of no cause of action were brought by Sam C. Barbera, Jr., Guarisco-Barbera Pontiac-Cadillac-GMC, Inc., and by General Motors Corporation. The exceptions were sustained, but plaintiffs were afforded additional time to amend their petition(s) so as to state a cause of action. A second supplemental and amending petition was filed as to both consolidated cases, alleging that these parties defendant had induced Guarisco, Sr. to breach his contract with Moss, and further alleging an illegal conspiracy in restraint of trade. All parties again raised the peremptory exception of no cause of action, which was sustained in favor of Guarisco Motor Company, Inc., Sam C. Barbera, Jr., Guarisco-Barbera Pontiac-Cadillac-GMC, Inc., and General Motors Corporation; and which was denied as to Anthony J. Guarisco, Sr. Plaintiffs now appeal the ruling of the trial court dismissing their suit as to the other four defendants.

FACTS
The petition(s) filed by plaintiffs make the following allegations of fact: In February, 1976, Moss contacted Guarisco regarding a possible future sale of the Pontiac dealership in Morgan City, Louisiana. At that time Guarisco advised Moss that the dealership (in which Guarisco and his brother John each owned fifty percent) would be for sale in the near future. Moss allegedly maintained contact with Guarisco in this vein through August 1978, at which time Guarisco advised Moss that Guarisco was to buy out his brother's interest in the present Pontiac dealership (i.e., Guarisco Motor Company, Inc.). Guarisco agreed to enter into negotiations with Moss. Moss then contacted General Motors Corporation, Pontiac Division, to ascertain the requirements for a transfer of the Pontiac franchise to him. Pontiac told Moss that a formal application *326 would have to be submitted for approval, together with a written buy-sell agreement between Moss and Guarisco.
On October 1, 1978, Moss and Guarisco purportedly finalized negotiations for the transfer of the Pontiac dealership and the parties agreed that a written contract would be signed on October 20, 1978. On October 9, 1978, Moss received the application for sales agreement from Pontiac which had to be submitted to Pontiac in order for Moss to be awarded the Pontiac dealership. On October 20, 1978, Moss and Guarisco approved and signed the buy-sell agreement as well as the application to Pontiac, both of which were immediately forwarded to GMC's Pontiac Division in Memphis, Tennessee. The buy-sell agreement between Moss and Guarisco provided that Guarisco was obligated to do the following:
(1) Purchase his brother's (John Guarisco) 50% stock interest in the old Guarisco Motor Co., Inc., which would then give Anthony Guarisco a 100% interest therein,
(2) Purchase in his name all of the assets from Guarisco Motor Co., Inc.,
(3) Form a new corporation with Moss under the name of Guarisco-Moss Motors, Inc. as the new dealership with the following provisions:
(a) $200,000 paid in capital, with Guarisco owning 75% and Moss owning 25%;
(b) Guarisco would pay in part for his shares by transferring to the new corporation certain assets of Guarisco Motor Co., Inc. (the old corporation).
(c) Moss would be Chairman of the Board, President, Pontiac Dealer and Manager, and Guarisco would be the Vice President of the new corporation;
(d) Moss or Guarisco-Moss Motors, Inc. would lease from Guarisco the land and buildings on which Guarisco Motor Co., was presently located for a term of 21 years;
(e) Guarisco-Moss Motors, Inc. would be a closed corporation, and Guarisco was obligated to sell to Moss all of his 75% stock ownership in the new corporation over a 5 year period from date of incorporation.
The buy-sell agreement was dated October 20, 1978 and was recorded in the conveyance records of St. Mary Parish on October 23, 1978. As per the buy-sell agreement, Moss deposited an unencumbered $50,000 into the Guaranty Bank and Trust Company of Morgan City on October 23, 1978.
On or about October 24, 1978, Moss was advised by Pontiac that his application was being returned unopened. Moss immediately contacted Guarisco, who told Moss that he was negotiating with a third party for sale of the dealership. Moss alleged that the reason his application to Pontiac was returned unopened was because Pontiac was requested to do the same by Guarisco. On or about October 27,1978, Guarisco flew to Memphis, Tennessee to confer with Pontiac. At that time Guarisco admitted to Pontiac that he had signed a written buy-sell agreement with Moss, but Guarisco represented that he did not consider himself bound by the agreement. Pontiac requested Guarisco to submit the name of the party to whom Guarisco wished the sales and service application granted. Guarisco formally notified Pontiac on November 6, 1978, that he wished to remove Moss from consideration for the Pontiac dealership in Morgan City. On November 13, 1978, Moss caused the incorporation of Guarisco-Moss Motors, Inc. pursuant to the buy-sell agreement.
After making written formal demand on Guarisco for performance of the October 20 buy-sell agreement, Moss filed the first suit, No. 14395, on December 22, 1978, alleging breach of contract. Moss simultaneously filed a notice of lis pendens in the public records of St. Mary Parish.
In the original and supplemental and amending petitions in the consolidated suits, plaintiffs allege that one Sam C. Barbera, Jr. at some indefinite time subsequent to the execution of the Moss-Guarisco buy-sell agreement, approached Anthony Guarisco, Sr. and offered him more consideration for the Pontiac dealership than had been offered by Moss. Subsequently, Guarisco *327 removed Moss's name from consideration by Pontiac for the new dealership. Negotiations between Guarisco and Barbera continued, culminating in a deal whereby Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. was formed.
Subsequent to the first suit and the lis pendens being filed, the assets of the old Guarisco Motor Company, Inc. were transferred to the new Guarisco-Barbera corporation, and a lease of the lands formerly occupied by the old dealership was executed in favor of the new corporation. Thereafter Pontiac named Sam C. Barbera, Jr., as the new Pontiac dealer-operator for Morgan City, Louisiana, presumably at the request of Guarisco.
The above allegations of facts have been gleaned from a thorough reading of the petition in the first suit No. 14395, and the first supplemental and amending petition thereto, the petition from the second suit, No. 14396, and the second supplemental and amending petition (pertaining to both suits.) Since the two consolidated cases are before us on exceptions of no cause of action, all well pleaded facts of the plaintiffs' petition must be accepted as true and interpreted most favorably to the plaintiffs. It is then our duty to determine whether the allegations set forth a cause of action. Haskins v. Clary, 346 So.2d 193 (La.1977); Linzay v. Tangipahoa Parish Farm Bureau, 387 So.2d 1343, (La.App. 1st Cir. 1980).

ASSIGNMENTS OF ERROR
Plaintiffs assign the following specifications of error:
(1) The District Court erred in finding that plaintiffs' suits failed to state a cause of action ex delicto for tortious interference with contract.
(2) The District Court erred in holding that plaintiffs' suits failed to state a cause of action based on fault, conspiracy, La.C.C. arts. 2315 and 2324, and conspiracy to restrain trade and commerce.
(3) The District Court erred in holding that plaintiffs' suits failed to state a cause of action ex contractu for specific performance, damages for breach of contract and breach of implied contract.

INDUCING BREACH OF CONTRACT
Plaintiffs ascribe as error the holding of the trial court that Louisiana does not recognize an action ex delicto for inducing a party to a contract to breach same. Plaintiffs assert that pronouncements in dicta in National Safe Corporation v. Benedict and Myrick, Incorporated, 371 So.2d 792 (La. 1979) by the Supreme Court, and by this court in Linzay v. Tangipahoa Parish Farm Bureau, 387 So.2d 1343 (La.App. 1st Cir. 1980), indicate that such a tort may be recognized by Louisiana courts.
Plaintiffs allege that Sam C. Barbera, Jr. induced Anthony Guarisco to breach his buy-sell agreement with Moss by offering more money for the transfer of the Pontiac dealership. Pontiac is accused of inducing Guarisco to breach the buy-sell agreement by failing to award the franchise to Moss, even though Pontiac admittedly did not need the cooperation or permission of Guarisco to award the franchise. Similarly, Guarisco and Barbera are accused of inducing Pontiac to breach an implied contract with Moss, whereby Moss alleges that Pontiac bound itself to award the franchise to him if he filled out and submitted the proper applications. No allegations of inducing breach of contract are made against the other named defendants, Guarisco Motor Company, Inc. and Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. The trial judge held that no claim for inducing breach of contract could be asserted against any party defendant because such a cause of action ex delicto is not recognized in Louisiana.
The early Louisiana cases on this subject primarily dealt with tenant-farmers or laborers who were driven from their fields because of harassment, coercion, or threats. The lessor or employer was allowed to recover on the grounds that the third party transgressed lawful means in settling a dispute, by conduct that was violative of the criminal laws or tortious vis-a-vis the tenant *328 or laborer who fled the fields.[1] it was stated that the damages to the lessor or employer (usually a loss of crops as rent) was the direct result of the unlawful conduct of the third party. These early cases are the basis for Professor Prosser's statement that Louisiana does not recognize a cause of action for inducing breach of contract unless the method of inducement is of itself unlawful.[2]
Yet, a review of the jurisprudence does reveal two cases where recovery was allowed even though the conduct of the third party was not actionable per se. In Martin v. Sterkx, 146 La. 489, 83 So. 776 (1920), the defendant uninvitedly entered a house belonging to the plaintiff, and informed the plaintiff's tenants that they would have to leave the premises, since there was a lawsuit pending involving title to the property. The pending suit involved not the claim of the defendant, but that of the aunt of the parties, who had sold the property to the plaintiff. The tenants, for fear of eviction, failed to make improvements on the property, and as a result no crop was raised, a part of which was to accrue to plaintiff as rent. The Supreme Court held that the defendant was liable on the grounds that her conduct was "officious and meddlesome," although it appears that this conduct was not unlawful or actionable per se. Similarly, in Carson v. Stephens, 14 La.App. 272, 129 So. 381 (2nd Cir. 1930), recovery was allowed when the plaintiff, a building contractor, was advised by one Gladney, a black man, not to proceed with their contract to build Gladney's house. Gladney was persuaded to cancel the contract when his prospective neighbors called upon him and informed him that he would not be permitted to take residence if the building was completed. The Second Circuit allowed the building contractor to recover against the neighbors even though no direct threats of violence or harassment were made to Gladney. Martin and Carson are exceptional cases in that recovery was allowed although the conduct of the third party was not of itself unlawful or actionable, but are explainable in that the third party went much farther than merely inducing a party to break the contract. In the instant case, the plaintiffs do not allege any unlawful or actionable conduct by Barbera or Pontiac against Guarisco which may have coerced Guarisco into breaching the buy-sell agreement. Nor do the plaintiffs allege any unlawful or actionable conduct by Barbera or Guarisco against Pontiac which may have coerced Pontiac to breach its implied contract to award Moss the dealership.
The vast bulk of the Louisiana jurisprudence deals not with the exceptional types of cases mentioned above, but rather, as in the instant case, involves a third party's mere inducement of a contracting party to breach his contract, as opposed to threats and coercion. The initial case, Kline v. Eubanks, 109 La. 241, 33 So. 211 (1902) has been by far the most influential and most often cited. Kline involved the classic luring away of a competitor's employee, in this case a farm laborer. The Supreme Court upheld the trial court, holding that the allegations of enticing away and knowingly employing a laborer under contract with another did not set forth a cause of action under Civil Code Article 2315. The rationale for the decision was that the laborer, who deserted his former employer, was the cause of damages. The laborer, who was a free agent, was the proximate cause, and the enticing employer was but a remote cause of the damages. The Supreme Court expressly distinguished the mere inducement to breach from those prior cases where the breach was caused by coercion. The coercion-type cases were held inapplicable since in those cases the third party's only intention was to injure the plaintiff.[3] In Kline, the Supreme Court stated that the third party was attempting to benefit himself, and not merely trying to injure the plaintiff. Thus, a mere inducement to *329 breach was not of itself actionable under Civil Code Article 2315. Justice Breaux added parenthetically that Civil Code Article 2315 was meant only to encompass those quasi-offenses which were recognizable at its inception, and that tortious inducement to breach a contract had not been at that time recognized.
Kline was not decided on the basis of any Louisiana statute or jurisprudence. Although prior Louisiana cases were distinguished, an objective reading of the opinion shows that the decision was made primarily after a survey of the commentators and cases from common-law states. Particular cases from Kentucky, Maryland, California, and Missouri are cited. Also cited as persuasive are the common-law commentators Cooley and Jaggard. These common-law authorities were not a proper basis for an interpretation of Article 2315 of the Louisiana Civil Code; however, Kline was cited as controlling for the next fifty years. This is a situation where the Supreme Court made a particular stand on an issue, after examining its treatment by other states, and from that moment onward, further discussion of the issue was neglected because the original position taken had magically become "well-settled law." Significantly, the four states whose decisions were cited in Kline have long since reversed or modified their refusal to recognize tortious breach of contract.[4] In recent years, Louisiana appellate courts have cited Cust v. Item Co., 200 La. 515, 8 So.2d 361 (1942), as authority for refusing to recognize a cause of action for inducing breach of contract. Yet, Cust relied solely on Kline v. Eubanks and its progeny, and provided no rationale for the present position. Louisiana's refusal to recognize this tort is apparently unique in the United States.[5]
The last case in which the Supreme Court dealt with this question in more than a parenthetical manner amply illustrates the harshness of the Louisiana position. In Templeton v. Interstate Electric Co., 214 La. 334, 37 So.2d 809 (1948), the plaintiff operated a franchise store on behalf of the defendant. The plaintiff negotiated a sale of the franchise to one Hearne. The defendant refused to approve the transfer until the plaintiff settled his open account for inventory with the defendant. The plaintiff protested that the only way he could liquidate enough to settle the open account was to sell the franchise. The defendant promptly cancelled the franchise agreement and awarded the franchise to Hearne. Hearne then breached the buy-sell agreement with the plaintiff. The Supreme Court recognized that the defendant apparently wanted to force the plaintiff to sell off his inventory to Hearne at a bargain price, since no other method of liquidation would be available to the plaintiff, since the franchise sales agreement was breached. The Supreme Court further stated that the refusal to allow a transfer of the franchise, and the immediate granting of a new franchise to Hearne by the defendant illustrated the complete insincerity of the defendant. Nonetheless, damages were assessable only against Hearne and not against the defendant franchisor, since the Supreme Court reiterated its position that one who is not a party to a contract is not liable in damages to one of the parties to the contract for inducing the other party to break the contract, citing Cust v. Item Co., supra. Thus, in Templeton even conduct which was obviously substandard was left uncompensated because of blind adherence to Kline and its progeny.
Civil Code Article 2315 reads in pertinent part, "Every act of man that causes damage to another obliges him by whose fault it happened to repair it." This article and its emphasis on fault is the basis for the general *330 law of torts in Louisiana. There is no definition of what constitutes fault for purposes of Article 2315. It may be said that fault occurs when one does not that which he ought to do, or when he does that which he ought not to do.[6] Thus, inherent in the notion of fault is the idea that some actions or failures to act cannot be condoned by society or by the judiciary, because such conduct does not measure up to the standards which society imposes upon its individual members. However, it is axiomatic that the standards which society imposes upon individuals are in a constant state of flux. Morals, mores, customs, and folkways of the populace form the basis of what is perceived as "oughts" and "ought nots," and are ever changing. Thus, Justice Breaux's assertion in Kline v. Eubanks that Civil Code Article 2315 included only those torts which were recognized at its inception is wholly untrue. The Supreme Court cannot and does not interpret Article 2315 on the basis of nineteenth century morality. The greatness of the civilian tradition in general and Article 2315 in particular is its ability to adapt the interpretation of law to the needs of the people. Professor Ferdinand Stone[7] expressed this idea in this manner:
"Louisiana, with her heritage of civilian doctrine in a broad principle of tort liability of which 2315 ... is a great example, is possessed of a system of liability at once simple and coherent which is broad enough to encompass the changing behavior pattern of the people and developing social and legal notions of wrongful conduct."
Thus, the Louisiana Supreme Court has been unjustified in its unflinching adherence to Kline v. Eubanks and the cases which follow it, since this adherence has been without any examination of the changing social and economic conditions of the twentieth century. The adherence to Kline has resembled the common-law doctrine of stare decisis in that one case decision instantly became "well-settled law."
Virtually every state in the Union (other than Louisiana) recognizes a cause of action for inducing breach of contract. France, whose Code Napoleon Article 1382 was the direct source for our Article 2315, also has recognized such a cause of action.[8] These civil and common law jurisdictions have recognized that although a contract binds only those party to its making, third persons may not unjustifiably interfere with a party's reasonable expectation in having the contract performed. Modern business considerations have led the judiciary to afford greater protection to a contracting party's specific right to performance than that afforded to an outsider's general right to compete. Louisiana's refusal to recognize a cause of action for inducing a breach of contract has been ably criticized[9] and the time is ripe for re-evaluation of the Louisiana position.
However, as an intermediate appellate court, we are duty-bound to apply the law as it is pronounced by our Supreme Court. The last direct pronouncement was in 1948 in Templeton v. Interstate Electric Co., supra. The Supreme Court did not recognize a cause of action for inducing a breach of contract in Templeton, and this we are bound to follow. The initial recognition of an interpretation of Article 2315 which would allow a cause for inducing breach of contract is of necessity left to our Supreme Court, see Johnson v. St. Paul Mercury Insurance Company, 256 La. 289, 236 So.2d 216 (1970); National Safe Corporation v. Benedict & Myrick, Inc., 364 So.2d 169, 171 (La.App. 1st Cir. 1978); Henderson v. Travelers Insurance Company, 346 So.2d 816, 819 (La.App. 1st Cir. 1977). We must reluctantly hold that the trial court was *331 correct in finding that as yet no cause of action exists in Louisiana for inducing breach of contract.
The plaintiffs' reliance on Linzay v. Tangipahoa Parish Farm Bureau, supra and National Safe Corporation v. Benedict and Myrick, Incorporated, supra, for its contention that a cause of action for inducement is possible in Louisiana, is misplaced. In National Safe Corporation, the Supreme Court held that the suit involved was not brought ex delicto, but rather ex contractu. After being sued on an open account, Benedict and Myrick brought a reconventional demand against National Safe, alleging that National Safe breached its contract with Benedict and Myrick by luring away one of its employees. The Supreme Court expressly declined to discuss tortious inducement to breach of contract, and decided the issue solely on the basis of the contract between the parties. In Linzay supra, this court recognized that no cause for inducement exists at present, and went on in dicta to explain that the tort could not have occurred under the facts presented. The case is not, as appellants argue, an implicit recognition that such a cause of action is available under Civil Code Art. 2315. Neither of the cases cited by the appellants modified or reversed the present Louisiana position.
We note parenthetically that even were Louisiana to recognize tortious inducement to breach of contract, the allegations of the appellants pleading state at best only a cause of action against Sam C. Barbera, Jr. As will be explained further below, no implied contract existed between Pontiac and Moss, since the dealership transfer application expressly negated the formation of same. Thus no inducement of Pontiac to breach an implied contract by Guarisco and Barbera could have occurred. In addition, Pontiac could not have induced Guarisco to breach the buy-sell agreement with Moss, under the allegations made by the appellants. The appellants allege that Guarisco told Pontiac that he did not consider the Guarisco-Moss agreement to be binding upon him. This allegation by appellants negates the possibility that Pontiac induced a breach by Guarisco, since Guarisco himself represented to Pontiac that he was not bound to honor the buy-sell agreement. The only allegations of plaintiffs-appellants' pleadings which would state a cause of action for inducing breach are those made against Barbera, which allege that he induced Guarisco to breach the buy-sell agreement by offering Guarisco a better price.
Because we hold that as yet no cause of action for tortious inducement to breach of contract exists in Louisiana, the plaintiffs-appellants' assignment of error is without merit.

ARTICLE 2324 AND RESTRAINT OF TRADE
The plaintiffs argue that the trial court erred in finding that plaintiffs failed to state a cause of action based on fault, conspiracy, Civil Code Articles 2315 and 2324, and conspiracy to restrain trade and commerce.
The trial court found that La.R.S. 51:122, dealing with illegal conspiracy to restrain trade and commerce, had not been violated, since the second contract between Barbera and Guarisco was actually in promotion of competition, rather than restraining same. The trial court noted that La.R.S. 51:122 is similar in content to Section 1 of the Federal Sherman Anti-Trust Act,[10] and found that the allegations of fact made by the plaintiffs did not place the actions of Pontiac beyond the permissible ambit of corporate decision making. Since the sale of automobiles in interstate commerce was not suppressed or suspended in any appreciable manner, the trial court found no violation of La.R.S. 51:122 which could have inflicted civil liability on the defendants.
Plaintiffs-appellants now argue that liability under Civil Code Articles 2315 and 2324 is possible regardless of whether or not trade is actually restrained. The plaintiffs allege a conspiracy which *332 amounts to fault within the meaning of Articles 2315 and 2324. However, as pointed out by the Supreme Court in Cust v. Item Co., supra, and in Hartman v. Greene, 193 La. 234, 190 So. 390, (1939); cert. denied 308 U.S. 612, 60 S.Ct. 180, 84 L.Ed. 512; an action under Article 2324 will lie only if the conspirators have joined forces in the commission of an offense or quasi-offense. Thus Article 2324 does not impose liability by itself. Its applicability depends on the commission of an offense or quasi-offense. The only offenses or quasi-offenses alleged by plaintiffs involved inducing breach of contract and restraining trade. We have already held that at present no cause of action exists in Louisiana for inducing breach of contract. We agree with the trial court that the plaintiffs did not sufficiently allege an illegal restraint of trade and commerce under La.R.S. 51:122, since it was not alleged that the sale of automobiles in Morgan City was impaired by the actions of the defendants. Thus, since no viable offense or quasi-offense was alleged, no conspiracy could have occurred under Civil Code Article 2324 that might subject defendants to civil liability as joint tort-feasors.

SPECIFIC PERFORMANCE
Plaintiffs-appellants sued Anthony J. Guarisco, Sr. for specific performance of the buy-sell agreement. They assert also that a cause of action for specific performance exists against Pontiac; Barbera; Guarisco Motor Company, Inc.; and Guarisco-Barbera Pontiac-Cadillac-GMC, Inc.; since performance by all parties would be necessary to restore the contractual rights which were denied the plaintiffs, due to the present circumstances of the Pontiac dealership in Morgan City.
The following provisions of the Louisiana Civil Code are pertinent:
Article 1926:
"On the breach of any obligation to do, or not to do, the obligee is entitled either to damages, or, in cases which permit it, to a specific performance of the contract, at his option, or he may require the dissolution of the contract, and in all of these cases damages may be given where they have accrued, according to the rules established in the following section."
Article 1927:
"In ordinary cases, the breach of such a contract entitles the party aggrieved only to damages, but where this would be an inadequate compensation, and the party has the power of performing the contract, he may be constrained to a specific performance by means prescribed in the laws which regulate the practice of the courts."
Article 1928:

"The obligee may require that any thing which has been done in violation of a contract, may be undone, if the nature of the cause will permit, and that things be restored to the situation in which they were before the act complained of was done, and the court may order this to be effected by its officers, or authorize the injured party to do it himself at the expense of the other, and may also add damages, if the justice of the case require it." (emphasis ours)
It is clear from a reading of these articles that specific performance is not a cause of action of itself as is argued by plaintiffs-appellants, but is rather a remedy which the Civil Code allows for a breach of contract. Thus, the existence of a contract is necessary in order to compel a party to perform. The trial court correctly stated that specific performance as a remedy was only available against Anthony J. Guarisco, Sr., since Guarisco was the only defendant who was a party to the buy-sell agreement. The other defendants were not party to the contract, and the remedy of specific performance is not available against them. Thus, no cause of action for a breach of the buy-sell agreement is assertable against Sam C. Barbera, Jr.; Pontiac, or Guarisco-Barbera Pontiac-Cadillac-GMC, Inc.
We note further that the buy-sell agreement, which was an appendix to the original petition, states that Anthony J. Guarisco, Sr. was obligated to personally buy and obtain all of the assets of Guarisco *333 Motor Company, Inc. (the old dealership), and to personally buy the real estate where the dealership was located, and was obligated to transfer the assets and lease the real estate to the plaintiffs. Guarisco did not sign the buy-sell agreement in his corporate capacity. Because the assets of Guarisco Motor Company, Inc. were to be purchased individually by Guarisco before being transferred to the plaintiffs, then Guarisco Motor Company was not a party to the contract, since Guarisco acted upon his own behalf and not on behalf of the old corporation in signing the buy-sell agreement. Nor were the acts of Guarisco tantamount to the acts of the corporation in this respect particularly in light of the fact that John Guarisco still owned fifty percent of the stock in Guarisco Motor Company at the time Anthony Guarisco, Sr. signed the buysell agreement with Moss. Since the transfer of assets to the plaintiffs was to be by Anthony Guarisco personally, after his purchase of same from the old corporation, then Guarisco Motor Company cannot be said to have been party to the buy-sell agreement; and thus, specific performance as a remedy for breach of contract cannot be asserted against Guarisco Motor Company, Inc.
Plaintiffs-appellants contend that the actions and representations of Pontiac created an implied contract whereby Pontiac bound itself to award Moss the Morgan City dealership if he filled out and submitted the proper applications. Plaintiffs demand specific performance of the implied contract of Pontiac. We find that no such implied contract came into being. The "Application for Pontiac Dealer Selling Agreement" was made a part of the original petition in the first suit. The application reads in pertinent part:
"In making this application, I acknowledge and agree that: ....
(2) No one other than the General Manager, General Sales Manager or Assistant General Sales Manager of Pontiac has the authority to approve this Application for a Pontiac Dealer Selling Agreement for any dealership location; that such approval, if given, will be solely in the form of a written Dealer Selling Agreement executed on behalf of Pontiac and the party named as "Dealer" in the introductory paragraph thereof; and that any action taken, any expenditures made, or commitments assumed, by me, by anyone to be associated with me in the proposed dealership, or by the proposed dealership itself, prior to receipt by me of such written Dealer Selling Agreement shall be at my or their sole risk and responsibility without any liability or obligation whatsoever on the part of Pontiac or any of its representatives.
(3) No representative or employe of Pontiac, or any other person, has the authority or power to approve or effect in any manner whatsoever any change in or modification of the terms of this Application.
(4) Prior to receipt by me or the entity on behalf of which I am acting of an executed Pontiac Dealer Selling Agreement, I acknowledge that neither I nor it will be entitled to rely upon any representation or statement made to me or anyone else acting for such entity by any representative or employe of Pontiac, or any other person whatsoever."
The signature of William J. Moss appears at the bottom of the page of the Application containing these conditions. In light of these express conditions of the Pontiac dealership application, we find that no implied contract was formed, and pretermit any discussion of statements and/or representations made to Moss by or on behalf of Pontiac.
In summary, since Anthony J. Guarisco, Sr. was the only defendant who was a party to the buy-sell agreement, specific performance as a remedy for breach of contract is available only against Guarisco. Nonetheless, since Guarisco-Moss Motors, Inc. was not a party to the buy-sell agreement (since the Guarisco-Moss corporation had not yet come into existence), there is some question whether Guarisco-Moss Motors, Inc. as a party plaintiff may demand specific performance of the buy-sell contract. *334 We hold that Guarisco-Moss Motors, Inc. may demand specific performance, inasmuch as Guarisco obligated himself to transfer assets of the old corporation to Guarisco-Moss Motors, Inc. in exchange for 75% of the Guarisco-Moss stock. This obligation is a written subscription for corporate shares, which according to La.R.S. 12:71(C) may be enforced by the corporation in its own name, after corporate existence has begun.
Additionally, the trial judge was mistaken when he stated that the plaintiffs could not obtain cancellation of the Guarisco-Barbera contract since plaintiffs were not a party to that contract. Plaintiffs promptly and properly recorded the buy-sell agreement in the public records of St. Mary Parish on October 23, 1978; and on December 22, 1978, filed a notice of lis pendens as to the affected real estate involved. The transfer of the assets of Guarisco Motor Company by Guarisco to the new Guarisco-Barbera Corporation and the lease of the real estate by Guarisco to the new corporation came subsequent to December 22,1978. The suit for specific performance is a claim by plaintiff Guarisco-Moss Motors that the assets of the old dealership are owned by it. Thus, Article 2453 of the Civil Code is applicable which states:
"Art. 2453. The thing claimed as the property of the claimant can not be alienated pending the action, so as to prejudice his right. If judgment be rendered for him, the sale is considered as a sale of another's property, and does not prevent him from being put in possession by virtue of such judgment. Nor shall it be lawful for debtors or third possessors of property, subject to a mortgage of any kind, to transfer or alienate such property, pending an action to enforce the mortgage, and any transfer or alienation made in contravention of the provisions of this article, shall have no effect as against the plaintiff, or plaintiffs, in such pending action."
Should the trial court find eventually that the plaintiffs are entitled to specific performance of the buy-sell agreement, Civil Code Article 2453 will enable the trial court to cancel the transfer of assets to Guarisco-Barbera, in light of the fact that the prior Moss-Guarisco contract was recorded in the public records. Barbera is presumed to have knowledge of the prior contract, and cannot complain of a denial of due process should the transfer of assets to Guarisco-Barbera be eventually cancelled. Similarly, the lease to Barbera and/or Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. of the real estate on which the dealership is situated can be voided because of the lis pendens filed by Moss prior to the execution of the Guarisco-Barbera lease.
On remand, it will be the task of the trial court to determine whether a specific performance of the Moss-Guarisco buy-sell agreement is warranted under the circumstances of the case, should plaintiffs prevail ex contractu against Anthony J. Guarisco, Sr. The trial judge will be guided by the recent pronouncements of the Supreme Court in J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896 (La.1981), in determining whether specific performance is a proper remedy in this case.
We note ex proprio motu under the authority of La.C.C.P. art. 927 that Sam C. Barbera, Jr. and Guarisco-Barbera Pontiac-Cadillac-GMC, Inc. are indispensable parties to these consolidated suits inasmuch as these parties hold assets and/or are parties to contracts which may be affected by the final outcome of these proceedings.[11] Therefore, on remand plaintiffs shall join these parties by necessary pleadings within 15 days of the finality of this judgment or suffer dismissal of their suits.
Therefore, for the above and foregoing reasons, the judgment of the trial court is affirmed and the consolidated cases are remanded for further proceedings consistent with the views expressed hereinabove. All costs of this proceeding are assessed to plaintiffs-appellants.
AFFIRMED AND REMANDED.
*335 PONDER, Judge, dissenting.
I dissent.
My quarrel with the majority is that they do not make the step to which their reasoning and conclusions logically lead, the holding that plaintiff has a cause of action for inducement of breach of contract.
It is ironic that the common law sources upon which the court in Kline v. Eubanks, 109 La. 241, 33 So. 211 (1902), relied have since been overruled in those states despite the stare decisis principle which prevails here and that we are the sole, or practically sole follower of the original jurisprudence that there is no such cause of action, even though we say that stare decisis does not control our decisions.
In accord with the spiritand wordsof Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978), I would look to the Civil Code as the primary source, recognize that Kline v. Eubanks incorrectly relied on other state sources, later abrogated by those states and that stare decisis "should not be thought controlling in this state" and make the holding that the majority so obviously hopes the Supreme Court will make.
NOTES
[1] Cf. Sandlin v. Coyle, 143 La. 121, 78 So. 261 (1918); Kerman v. Humble, 51 La.Ann. 389, 25 So. 431 (1889); Dickson v. Dickson, 33 La.Ann. 1261 (1881).
[2] Prosser, Law of Torts, P. 930 (4th Ed. 1971).
[3] Citing Dickson v. Dickson, supra note 1.
[4] Kentucky: H. Friedberg, Inc. v. McClary, 173 Ky. 579, 191 S.W. 300 (1917). Maryland: Knickerbocker Ice Co. v. Gardiner Dairy Co., 107 Md. 556, 69 A. 405 (1928). California: Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 112 P.2d 631 (1941). Missouri: Downey v. United Weatherproofing Co., 363 Mo. 852, 253 S. W.2d 976 (1953).
[5] Prosser, Law of Torts, p. 930 (4th Ed. 1971); see in dicta National Safe Corporation v. Benedict and Myrick, Incorporated, 371 So.2d 792 at 794 (La. 1979).
[6] See 2 Planiol, Traite Hementaire De Droit Civil, §§ 363-366, (1939), see also Louisiana Civil Code Article 2316.
[7] Stone, "Tort Doctrine in Louisiana," 16 Tul.L. Rev. 489, 511 (1942).
[8] Simmons and Kabacoff, "Inducing Breach of Contract," 30 La.L.Rev. 713, 724 Note 52 (1970).
[9] See generally, Simmons and Kabacoff, "Inducing Breach of Contract", 30 La.L.Rev. 713 (1979).
[10] 15 U.S.C. § 1.
[11] See State, Department of Highways v. Lamar Advertising Company of Louisiana, Inc., 279 So.2d 671 (La.1973) for a discussion as to what is an indispensable party.